Filed 8/4/23  In re Victoria A. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Victoria A., a Person Coming Under the Juvenile Court Law. | B322340 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP04937) |
| Plaintiff and Respondent, | |
| v. | |
| Kimberly S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Kimberly S.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

# INTRODUCTION

Kimberly S. appeals from the juvenile court's order terminating her parental rights to her five-year-old daughter Victoria A. under Welfare and Institutions Code section 366.26.[1] Kimberly argues the juvenile court erred in finding the parental-benefit exception to adoption (§ 366.26, subd. (C)(1)(b)(i)) did not apply because, in her view, the evidence supported a finding Victoria had a strong, positive attachment to her and the court did not correctly apply the legal standard in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).  Kimberly also argues the court erred in finding the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) did not apply.  Because the court did not prejudicially err in making either finding, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Victoria Tests Positive for Drugs at Birth, and the Juvenile Court Removes Her from Kimberly*

When Victoria was born in July 2018, she tested positive for methamphetamine and amphetamine.  A social worker from the Los Angeles County Department of Children and Family Services interviewed Kimberly, who stated that she used methamphetamine two or three months before delivering Victoria and that she "might have been around people who had been using."  Michael A., Victoria's father, told the social worker that he was "a meth user" and that he took "a few hits" of

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

methamphetamine "every morning," but that he would not "use meth anymore." A few days later Kimberly, with Victoria, checked herself into an inpatient substance abuse treatment center.

The Department filed a petition under section 300, subdivision (b), alleging (1) Kimberly's substance abuse placed Victoria at substantial risk of serious physical harm; (2) Kimberly's history and current use of methamphetamine interfered with her ability to provide regular care and supervision for Victoria, and (3) Michael's substance abuse rendered him incapable of providing regular care and supervision for Victoria. The court detained Victoria from Michael and released her to Kimberly on the condition that Kimberly remain in the inpatient substance abuse treatment program or, if she completed the program, that she reside with her mother, Maribel O. The court warned Kimberly that, if she left the program without completing it or did not test clean, the court would remove Victoria from her care.

On September 26, 2018 Kimberly and Michael pleaded no contest to the allegations in the petition as amended,[2] and the court declared Victoria a dependent child of the court. The court removed Victoria from Michael, released her to Kimberly, and ordered Kimberly to complete parenting classes and extensive drug rehabilitation.

One month later, Kimberly completed her residential substance abuse treatment program and moved with Victoria into Maribel's home. Eight months after that, the Department

---

[2] The court combined the two counts against Kimberly into one and made minor changes to the sustained allegations against Michael that are not relevant to this appeal.

3

observed that Kimberly had complied with her case plan and court-ordered programs and that Victoria appeared happy and "very well cared for by her mother." The Department recommended the court terminate jurisdiction and grant joint legal (with Michael) and sole physical custody of Victoria to Kimberly.[3]

One month later, Kimberly experienced a relapse and tested positive for amphetamine and methamphetamine. The social worker also discovered that Kimberly no longer lived with Maribel, which, as stated, was a condition the juvenile court had imposed when the court released Victoria to Kimberly. The Department filed a supplemental petition under section 387, alleging Victoria failed to comply with the court's orders. On July 19, 2019 the court detained Victoria from Kimberly and placed her with Maribel. The court ordered monitored visitation for Kimberly for a minimum of three times per week for three hours each visit. Two months later, the court sustained the allegations in the supplemental petition and removed Victoria from Kimberly.

B. *Kimberly Fails To Reunify with Victoria*

At the six-month and 12-month review hearings (§ 366.21, subds. (e), (f)), the juvenile court found Kimberly's progress toward alleviating or mitigating the causes necessitating placement of Victoria outside her home had "not been

---

[3] Michael did not comply with his case plan and failed to make progress toward addressing the causes that gave rise to Victoria's placement outside his home. The court ultimately terminated his parental rights to Victoria. He is not a party to this appeal.

4

substantial." The Department's status reports included multiple positive toxicology test results. The court concluded returning Victoria to Kimberly would create a substantial risk of detriment and maintained Victoria's placement with Maribel. On October 16, 2020 the court terminated reunification services for Kimberly and set the matter for a selection and implementation hearing under section 366.26.

As Kimberly struggled to maintain sobriety, she also failed to have consistent, quality visits with Victoria. For the first few months after the court removed Victoria from her care, Kimberly visited Victoria three times a week and was "loving and attentive" with her; Victoria "showed a preference toward [Kimberly] and appeared comfortable in her arms." The social worker reported, however, that by February 2021 Kimberly's visits had "become less frequent and consistent as time has passed." Maribel reported that, during visits, Victoria was not "receptive" to Kimberly and did not "show any signs of distress" when Kimberly left. The social worker observed Kimberly interacted "generally well with Victoria," except when Kimberly would "ignore Victoria to use her cellphone." The social worker stated Victoria appeared "very bonded" to Maribel and called her "'Mama.'"

In the winter of 2021 Kimberly gave birth to a baby boy, Izaiah S. The Department placed Izaiah with Jose S. (Victoria's maternal grandfather), who shared a home with Maribel (and Victoria).[4] Because Kimberly could visit both children at the

---

[4] Izaiah tested positive for methamphetamine at birth. The Department found Kimberly continued to use "illicit substances" while pregnant with Izaiah and had not re-enrolled in any drug treatment programs. Izaiah is not a subject of this appeal.

5

same time, her visits became more consistent. According to Maribel, Victoria became "very jealous when anyone in the home [gave] Izaiah too much attention." Maribel stated she had to "redirect" Kimberly if she ignored Victoria and used her cellphone or focused on Izaiah. Maribel said Kimberly had "little patience" for Victoria and did not seem able to "redirect" her in an "age appropriate manner."

One morning in June 2021 Izaiah ingested amphetamine and had to be hospitalized. In investigating this incident, the social worker discovered Maribel had violated the juvenile court's order by allowing Kimberly to visit Victoria without a court-approved monitor. Maribel admitted to the social worker that Kimberly visited Izaiah without any supervision that morning, that Kimberly spent the night in her home on two previous occasions (while Victoria was present), and that Maribel had left Victoria alone with Victoria's maternal great-grandmother (who was not an approved monitor).

On June 9, 2021 the social worker placed Victoria in the home of Angelica S., Victoria's maternal great aunt. The Department filed a supplemental petition under section 387, alleging Maribel failed to comply with the court's order (for monitored visitation), which endangered Victoria's physical health and safety and placed her at risk of serious physical harm. The court vacated its order placing Victoria in Maribel's home.

In the first few months of Victoria's new placement, Kimberly visited only "sporadically," often canceled visits, and failed to confirm her visits with the social worker. Kimberly explained to the social worker that she could not visit consistently because she had to "'run errands,'" did not want the visits to take place at the park, or did not have transportation

(the social worker said she had offered Kimberly a bus pass).  The social worker observed Victoria did not appear "extremely attached" to Kimberly and did not show an "excessive amount of distress" when visits ended.

By November 2021 Kimberly was visiting Victoria once a week and often "cut her visit short."  Kimberly said she was "happy just to see her children briefly."  The social worker observed Victoria enjoyed "taking up all of her mother's attention."

Four months later, in a report summarizing Kimberly's visitation, the social worker reiterated her prior observations that Kimberly's visits had become inconsistent and that Kimberly frequently did not confirm visits, occasionally missed visits, and "[m]ore often than not" cut the visits short.  The social worker stated that Victoria, while "familiar" with Kimberly, did not react to Kimberly when she left the visits, although Angelica observed in January 2022 that Victoria appeared "attached" to Kimberly and got "upset" when Kimberly left.  In a subsequent report the social worker concluded that Victoria did not appear "to be well-bonded" with Kimberly and seemed more entertained with the food Kimberly brought or the slides at the park and that Kimberly focused more on Izaiah during the visits.  In her final report before the selection and implementation hearing, the social worker stated the visits occurred only once or twice a week and, at Kimberly's request, did not last the full length of the time allocated for the visit.

Victoria's adjustment to her new placement, according to Angelica, was not "without challenges."  But by February 2022 Victoria had "become attached" to Angelica and her husband, Mr. S., and appeared to be "thriving" in their home.  The social

7

worker reported that Victoria was "happy and stable" in Angelica's care. Angelica and Mr. S. expressed their commitment to adopt Victoria.

###### C.     *The Court Terminates Kimberly's Parental Rights*

At the June 1, 2022 hearing under section 366.26 Kimberly testified that she visited Victoria three times a month, but that the social worker sometimes canceled the visits. Kimberly described her activities with Victoria at the park, which included playing with her, giving her food, and walking with Izaiah. According to Kimberly, at the beginning of visits Victoria would run to her, have a big smile on her face, and call her "mom." Kimberly acknowledged that Victoria also called Maribel and Angelica "mom," but asserted that Victoria knew Kimberly was "her mom." Kimberly said she and Victoria had "a good bond" and a "good relationship." When asked to explain why she believed she and Victoria had a bond, Kimberly responded: "I believe that, because [of] . . . the way we are with each other, the way she is with me. She's excited to see me. How we just get along. . . . We have this perfect bond, like, I don't know how to explain it." When asked to give an example of what Victoria did on a visit that made Kimberly believe they had a bond, Kimberly testified: "She smiles at me. . . . She's happy with me. How she wants to always play with me. How she wants me to, like, pay attention to her more. . . . And she knows I'm her mom." Kimberly admitted that in 2022 she visited Victoria only once in January, twice in February, and twice in March and that she did not visit again until May. Kimberly stated that, although she sometimes canceled visits, most of the time "they" canceled the visits. When asked to name Victoria's favorite color, Kimberly

8

replied, "I don't know." When asked whether she knew if Victoria had a favorite book, Kimberly said, "No, I don't. I mean, because I hardly see her and I hardly . . . have that connection with her because I hardly see her. You get me? . . . So there's not much time for me to get those stuff from her."

Counsel for Kimberly asked the court not to terminate Kimberly's parental rights because the parental-benefit exception applied. Counsel argued Kimberly did not visit more often because she "was under the impression she was only allowed one hour a week" and because the social worker sometimes canceled the visits. Citing Angelica's observation that Victoria "remains attached to [Kimberly] and gets upset when [she] leaves," counsel for Kimberly argued that Victoria would benefit from continuing to have a relationship with Kimberly and that losing contact with Kimberly would be detrimental to Victoria. Counsel for the Department argued that Kimberly did not regularly visit Victoria and that the evidence showed Kimberly played "the role of a distant relative or a family friend, but not somebody that [Victoria] really relies on for emotional stability or someone that conveys that maternal role."

The juvenile court found the question whether Kimberly visited consistently was "close." On the issue of the strength of Victoria's relationship with Kimberly, the court stated Kimberly did not occupy a "parental role" with Victoria. The court stated: "There's not such a substantial, positive, emotional attachment such that, . . . considering the benefits of a new adoptive home, . . . termination would harm [Victoria]." Finding the relationship between Kimberly and Victoria was "more akin to [that of] a family friend," the court ruled that, even if Kimberly met her burden on the "the first prong on visitation," she did not

9

meet her burden "on the second and third prongs."  The court found that Victoria was adoptable and that the benefit of her relationship with Kimberly was "outweighed" by the physical and emotional benefit of adoption.  The court terminated Kimberly's parental rights and transferred the care, custody, and control of Victoria to the Department "for adoptive placement and planning."  The court designated Angelica and Mr. S. as Victoria's prospective adoptive parents.  Kimberly timely appealed.

## DISCUSSION

### A.  *The Juvenile Court Did Not Err in Ruling the Parental-benefit Exception Did Not Apply*

1.  *Applicable Law and Standard of Review*
"If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing under section 366.26."  (*Caden C.*, *supra*, 11 Cal.5th at p. 630; see *Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624; *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.)  The purpose of a hearing under section 366.26 is "'to select and implement a permanent plan for the child'" after the juvenile court has terminated reunification services.  (*Caden C.*, at p. 630; see *In re Christopher L.* (2022) 12 Cal.5th 1063, 1076; *In re D.M.* (2021) 71 Cal.App.5th 261, 268.)  If the court finds "the child is likely to be adopted," the court must "terminate parental rights to allow for adoption."  (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1); *Christopher L.*, at p. 1076; *In re I.E.* (2023) 91 Cal.App.5th 683, 690.)  "But if the parent shows that termination would be detrimental to the child for at least one

10

specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B), (4)(A); *I.E.*, at p. 690.)  One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence:  (1) "[T]he parent has regularly visited with the child," (2) "the child would benefit from continuing the relationship," and (3) "terminating the relationship would be detrimental to the child."  (*Caden C.*, at p. 629; see § 366.26, subd. (c)(1)(B)(i); *In re Katherine J.* (2022) 75 Cal.App.5th 303, 316.)

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632; see *In re I.E.*, *supra*, 91 Cal.App.5th at p. 691; *In re A.L.* (2022) 73 Cal.App.5th 1131, 1151.)  To establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, at p. 636; see *I.E.*, at p. 691; *In re J.D.* (2021) 70 Cal.App.5th 833, 852.)  "Concerning the third element— whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption.  [Citations.]  Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship.  [Citations.]  What courts need to determine, therefore, is how the child would be affected

11

by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633; see *I.E.*, at p. 692; *A.L.*, at p. 1151.)

"A substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders' [citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it. [¶] The third element— whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. . . . All these factual determinations are properly reviewed for substantial evidence." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; see *In re I.E.*, *supra*, 91 Cal.App.5th at p. 691.) "Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. . . . The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, at pp. 639-640; see *I.E.*, at p. 691.)

2.      *Substantial Evidence Supported the Juvenile*
        *Court's Finding Kimberly Failed To Establish*
        *Victoria Had a Substantial, Positive Emotional*
        *Attachment to Her*

Substantial evidence supported the juvenile court's finding Victoria did not have a substantial emotional bond with Kimberly.[5]  According to the social worker's reports, at times Kimberly paid attention to Victoria and at times she did not, especially after the birth of Izaiah.  When Kimberly was able to focus on Victoria, their time together consisted of playing on the playground and eating.  Because Kimberly often cut short her visits with Victoria, there wasn't time for much else.  And because Kimberly visited Victoria only once a month during the six months before the section 366.26 hearing, it is not surprising she did not know Victoria's favorite book, snack, or color.  The social worker's reports indicated Victoria had trouble controlling her emotions, but there was no evidence Kimberly ever tried to redirect her or teach her how to use words to express her emotions.  Kimberly testified Victoria was always happy and excited to see her, but that would be true of a favorite friend or relative.  (See *In re G.H.* (2022) 84 Cal.App.5th 15, 25 ["Friendly or affectionate visits are not enough."].)

_____

[5]      As did the juvenile court, we assume without deciding that Kimberly consistently visited Victoria, though the record points to the contrary conclusion.  (See *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1073 ["It is unnecessary to address the first element (regular visitation and contact) despite the agency's argument that mother did not prove that element either, because the juvenile court did not err in rejecting the exception on other grounds."].)

13

Aside from the bare assertion she and Victoria shared a "perfect" bond, Kimberly did not provide any specific evidence to show Victoria was strongly attached to her. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 ["courts often consider how children feel about, interact with, look to, or talk about their parents"]; cf. *In re J.D.*, *supra*, 70 Cal.App.5th at p. 856-857 [mother's visitation logs showed how she encouraged, comforted, and taught her five-year-old son during their virtual visits and how he frequently expressed his affection for her].) Indeed, the social worker consistently observed that Victoria did not exhibit distress at the end of her visits with Kimberly and that Victoria seemed more interested in the playground equipment or snacks Kimberly brought for her. (See *In re I.E.*, *supra*, 91 Cal.App.5th at p. 692 [evidence the child "experienced no distress at the end of visits" supported the juvenile court's finding "the relationship was not so substantial that its severance would be detrimental to the child"].)

Kimberly argues she presented evidence Victoria had a substantial, positive emotional attachment to her. Kimberly, however, misunderstands the substantial evidence standard of review. "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 640; see *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1072.)

14

Thus, we do not assess whether Kimberly presented sufficient evidence Victoria had a strong, positive emotional attachment to her, but whether substantial evidence supported the juvenile court's finding Victoria did not. As discussed, substantial evidence supported that finding. Kimberly points to evidence Victoria was attached to her and became upset when the visits ended. But we presume the court discounted that evidence (Angelica's one-time comment in January 2022) because the social worker's observations, which covered a longer period than Angelica's observations, contradicted it. And those observations were substantial evidence supporting the juvenile court's finding.

Kimberly faults the social worker's reports for failing "to substantially address [Victoria's] attachment to [her]." By not making this argument at the hearing under section 366.26, however, Kimberly forfeited it.[6] (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"]; *In re G.C.* (2013) 216 Cal.App.4th 1391, 1399 ["father forfeited the right to complain that his parental rights had been terminated without an adequate selection and implementation report" because he failed to raise the issue in the juvenile court].)

In any event, Kimberly had the burden to prove Victoria had a significant emotional attachment to her. (See *Caden C.*,

[6] On February 17, 2022, in response to an objection from counsel for Kimberly, the court ordered the Department to prepare a last minute information report to address "the quality of parents' visits and any parent bond that they may have." The Department submitted a report on March 1, 2022 that summarized the interactions between Victoria and Kimberly. Counsel for Kimberly did not object to this (or any other) report.

15

*supra*, 11 Cal.5th at p. 636; *In re. J.R.* (2022) 82 Cal.App.5th 526, 530-531.) She had the opportunity at the selection and implementation hearing to present her version of the quality of her visits with Victoria, but provided only general conclusions there was a "good bond." As discussed, substantial evidence, including that Victoria spent three-fourths of her life outside of Kimberly's home and that, according to the social worker, Kimberly and Victoria at times showed little interest in each other, supported the court's finding Kimberly failed to meet her burden on this element of the parental-benefit exception.

3. *The Court Correctly Applied* Caden C.

Kimberly contends the juvenile court relied on "improper factors in assessing the third element" of the parental-benefit exception. In particular, Kimberly cites the court's comment: "'It does appear that [Kimberly] does not enjoy a parental role with the child.'" (Italics omitted.) The juvenile court did not err.

A finding the parent does not occupy a parental role does not necessarily mean the juvenile court failed to determine whether a child has a substantial, positive emotional attachment to the parent under the second element of the parental-benefit exception. The issue is whether the juvenile court assessed the relationship (or lack of one) using the proper factors (and not improper ones). For example, in *In re Katherine J.*, *supra*, 75 Cal.App.5th 303 the juvenile court stated the father had not occupied a "'significant parental role.'" (*Id.* at p. 319.) The court in *Katherine J.*, however, concluded the juvenile court in that case "also explained what it meant by this" term, which was that the father's "unresolved issues with substance abuse and violence" compromised his attempts to maintain "a strong,

16

positive emotional attachment" with his child.  (*Id.* at pp. 319-320.)

Here, although the juvenile court commented Kimberly did not have a parental role, the court also found Victoria did not have a "substantial, positive emotional attachment" to Kimberly. That was a finding on the issue the court was supposed to consider on the second element of the parental-benefit exception. (See *Caden C.*, *supra*, 11 Cal.5th at p. 636.)  The court explained the evidence showed Victoria's relationship with Kimberly was similar to that of a family friend, which was another way of saying the relationship lacked a strong emotional attachment "'from child to parent.'"  (*Id.* at p. 632; see *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 319 ["'for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt'"]; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230 ["an emotional attachment is one where the child views the parent as more than a mere friend or playmate and [whose] interactions with the parent were not ambivalent, detached, or indifferent"].)

Kimberly suggests the juvenile court may have considered improper factors, such as whether she failed to address her substance abuse problem or competently provided for Victoria's daily needs.  The record does not support this suggestion.  The court made clear it was not comparing Angelica and Kimberly or their homes and recognized it was "not a contest of who's better." And when the court found Kimberly had failed to demonstrate Victoria had a significant attachment to her, the court did not mention Kimberly's struggles with addiction.

Nor did the juvenile court consider any improper factors in ruling Kimberly failed to establish the third element under *Caden C.*, *supra*, 11 Cal.5th 614.  The court properly balanced the harm of terminating the "family-friend" relationship Victoria had with Kimberly against the "physical and emotional benefit" Victoria would derive from the permanency and stability of adoption, and the court found the latter outweighed the former.  Paraphrasing *Caden C.* at page 634, the court stated that, even where the child may never live with the parent, terminating a parent-child relationship "may be detrimental," which showed that the court recognized it should assess the harm to a child of losing a substantial, positive relationship with a parent, not whether the parent can provide a home for the child.

### B. *The Court Did Not Err in Ruling ICWA Did Not Apply, and Any Error Was Harmless*

#### 1.    *Relevant Proceedings*

On a Parental Notification of Indian Status (ICWA-020) judicial council form, Kimberly stated she did not have any known Indian ancestry, and on his form Michael stated he believed he may be a member of the Cherokee Tribe.  At the detention hearing the court confirmed that Kimberly stated she did not have any known Indian ancestry and that Michael stated he believed he had Cherokee ancestry on the maternal side of his family.  The court ordered the Department to speak with Michael's maternal grandmother and investigate whether her family had any connection to the Cherokee Tribe.

The Department investigator contacted Michael's grandmother, who provided information the investigator

18

documented on a Notice of Child Custody Proceedings for Indian Child (ICWA-030) form. The Department sent the ICWA-030 form to the Eastern Band of Cherokee Indians, the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee Indians, the Secretary of the Interior, and the Bureau of Indian Affairs.[7] The Department subsequently reported that the Eastern Band of Cherokee Indians stated Victoria was not an Indian child "in relation to the Eastern Band of Cherokee Indians" and that the Cherokee Nation of Oklahoma stated Victoria was not an Indian child "in relation to the Cherokee Nation."

Because the Department did not receive a response from the United Keetowah Band of Cherokee Indians, the social worker sent a second ICWA-030 notice to that tribe (along with all the other recipients of the first notice). She followed up with several phone calls to the United Keetowah Band of Cherokee Indians, but was unable to reach a representative of that tribe.

To investigate Victoria's possible Indian ancestry through Kimberly's side of the family, the social worker called Maribel (Victoria's maternal grandmother). When Maribel answered, she gave the phone to her daughter-in-law, Rocio M., who told the social worker that Maribel wanted Rocio to translate. The social worker asked Rocio if the family had any American Indian ancestry, and Rocio said her family did not. The social worker asked Rocio to ask Maribel if she was aware of any American Indian ancestry on the maternal side of the family, and Rocio said Maribel "denied having any American Indian ancestry." The social worker also interviewed Angelica (Victoria's caregiver and

_____

7 Kimberly does not challenge the adequacy of the notices to the Indian tribes.

19

maternal great aunt), who denied the family had any American Indian ancestry.

At the 12-month review hearing, the court found that the Department "exercised as much diligence" as it could to obtain information from the Indian tribes Michael identified and that "there's been no indication that there is any membership in a tribe that we can locate." The court found ICWA did not apply through Michael's side of the family. The court made an implied finding ICWA did not apply through Kimberly's side of the family.[8]

### 2. *The Department Fulfilled Its Duty of Inquiry*

Kimberly argues the juvenile court failed to ensure the Department complied with its duty of inquiry under section

---

[8] Citing the juvenile court's August 7, 2018 minute order after the detention hearing, the Department stated in its reports the court had found at detention ICWA did not apply through Kimberly's side of the family. The court, however, did not make that finding at the detention hearing. Thus, we again encounter a minute order that includes findings the juvenile court did not make, and again ask the court (or the clerk) to cease the practice of entering orders not made at the hearing (and ask the Department not to cite orders the court did not make). (See *In re T.G.* (2020) 58 Cal.App.5th 275, 298, fn. 20.) Nevertheless, because the juvenile court here made an inquiry at the detention hearing and considered the issue, the record in this case supports an implied finding ICWA did not apply. (See *In re G.A.* (2022) 81 Cal.App.5th 355, 362 [findings may be implied where the record reflects the juvenile court "'considered the issue and decided whether ICWA applies'"], review granted Oct. 12, 2022, S276056; *In re Asia L.* (2003) 107 Cal.App.4th 498, 506 [same].)

224.2, subdivision (b), to interview Victoria's maternal grandmother (Maribel), maternal great-aunt (Angelica), and maternal great-uncle (Mr. S.). The Department argues that the social worker interviewed Maribel (through Rocio, as a translator) and Angelica and that, because Mr. S. was married to Angelica, "it was unlikely he would have any additional information regarding ICWA." In her reply brief, Kimberly states that the social worker did not interview Maribel through a Spanish-speaking social worker and that, even though the Department asserts Mr. S. was married to Angelica, "it was still incumbent on [the Department] to ask the great-maternal uncle if there was Indian ancestry in mother's family."[9] Kimberly misconstrues the Department's duty to inquire about a child's possible Indian ancestry.

Congress enacted ICWA to "protect Indian children and to promote the stability and security of Indian tribes and families." (*In re T.G.* (2020) 58 Cal.App.5th 275, 287; see *In re J.C.* (2022) 77 Cal.App.5th 70, 77.)[10] "ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq. (2022)) set minimal procedural protections for state courts to follow before removing

---

[9] Kimberly does not dispute that Mr. S. is married to Angelica. There is no evidence Maribel had a brother who could also be Victoria's great-uncle.

[10] "'"Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.'" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 77, fn. 2; see 25 U.S.C. § 1903(4); § 224.1, subds. (a), (b).)

Indian children and placing them in foster care or adoptive homes." (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 316; see *In re Y.W.* (2021) 70 Cal.App.5th 542, 551.) "In addition to significantly limiting state court actions concerning out-of-family placements for Indian children [citation], ICWA permits an Indian child's tribe to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding." (*Rylei S.*, at p. 316; see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8.) ICWA requires a child protective agency to """notify the parent or Indian custodian and the Indian child's tribe . . . of the pending proceedings and of their right of intervention."'" (*Isaiah W.*, at p. 5; see 25 U.S.C. § 1912(a); *J.C.*, at p. 76.) "The notice requirement is at the heart of ICWA because it 'enables a tribe to determine whether the child is an Indian child and, if so, whether to intervene in or exercise jurisdiction over the proceeding.'" (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 429; see *Isaiah W.*, at p. 5.; *T.G.*, at p. 288.)

"To ensure Indian tribes may exercise their rights in dependency proceedings, . . . investigation of a family member's belief a child may have Indian ancestry must be undertaken." (*In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 316; see § 224.2, subd. (a) [the court and child protective services agencies "have an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child"]; *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 9; *In re T.G.*, *supra*, 58 Cal.App.5th at p. 289 ["just as proper notice to Indian tribes is central to effectuating ICWA's purpose, an adequate investigation of a family member's belief a child may have Indian ancestry is essential to ensuring a tribe entitled to ICWA notice will receive it"].) The duty to inquire "'begins with initial contact [citation] and obligates the juvenile court and child

protective agencies to ask all relevant involved individuals whether the child may be an Indian child.'" (*Rylei S.*, at p. 316; see § 224.2, subds. (a)-(c); *T.G.*, at p. 290.)

Section 224.2, subdivision (b), requires the child protective agency to ask "the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."[11] (See *In re J.C.*, *supra*, 77 Cal.App.5th at p. 77; *In re T.G., supra*, 58 Cal.App.5th at p. 290; Cal. Rules of Court, rule 5.481(a)(1).) Section 224.2, subdivision (e), imposes a duty of further inquiry regarding the possible Indian status of the child "'[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine there is reason to know that the child is an Indian child.'" (*In re Rylei S.*, *supra*, 81 Cal.App.5th at pp. 316-317; see Rule 5.481(a)(4) [social worker must conduct further inquiry if he or she "knows or has reason to know or believe that an Indian child is or may be involved"].) "If those inquiries result in reason to know the child is an Indian child, notice to the relevant tribes is required." (*Rylei S.*, at

---

[11] An "'extended family member' shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); see § 224.1, subd. (c); *In re J.C.*, *supra*, 77 Cal.App.5th at p. 78.)

p. 317; see 25 U.S.C. § 1912(a); § 224.3; *J.C.*, at p. 78; *T.G.*, at p. 290.)

"'The duty to develop information concerning whether a child is an Indian child rests with the court and the Department, not the parents or members of the parents' families.'" (*In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 317; see *In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 430.) "Thus, a juvenile court errs in making a finding ICWA does not apply to the proceedings without first ensuring that the Department has made an adequate inquiry under ICWA and California law, and if necessary, the court must continue the proceedings and order the Department to fulfill its responsibilities." (*Antonio R.*, at p. 431.) However, if """the court makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence."""" (*In re J.C.*, *supra*, 77 Cal.App.5th at p. 78; see § 224.2, subd. (i)(2); Cal. Rules of Court, rule 5.481(b)(3).)

Here, the Department fulfilled its duty of inquiry with respect to Victoria's extended family members on her mother's side by asking Maribel and Angelica about any possible Indian ancestry. Section 224.2 did not require the social worker to interview Mr. S., Victoria's great-uncle (by marriage), because the term "extended family members" under ICWA does not include great-uncles (by marriage or otherwise). (See 25 U.S.C. § 1903(2); § 224.1, subd. (c); see *In re D.S.* (2020) 46 Cal.App.5th 1041, 1053 [the term "extended family members" "does not include great-grandparents"].)

24

Kimberly does not argue the social worker should have interviewed Mr. S. because, as a prospective adoptive parent, he was someone who had "an interest in the child." (§ 224.2, subd. (b); see *In re A.C.* (2022) 86 Cal.App.5th 130, 131-132 [child protective agency had a duty to interview the child's caregiver and prospective adoptive parent as someone who has "'an interest in the child'"]; *In re Dominick D.* (2022) 82 Cal.App.5th 560, 564, fn. 2 [even if the great-grandfather was not an "extended family member," because he had been the child's "primary caregiver" he was "included within 'others who have an interest in the child,' for whom the statutory duty of initial inquiry is the same as for 'extended family members'"]; *In re M.B.* (2022) 80 Cal.App.5th 617, 629-630 [child protective agency failed to conduct an adequate inquiry because it "did not ask ICWA-related questions of the maternal great-aunt," who "had been identified as [the child's] prospective adoptive parent"].) Any error in failing to ask Mr. S. about Victoria's possible Indian ancestry, however, was harmless. As discussed, Maribel and Angelica, direct lineal ancestors of Victoria and in the same generation as Mr. S., both denied any Indian ancestry on their side of the family. In addition, Mr. S. was not in the same ancestral line as Victoria. In these circumstances, Kimberly has not shown how Mr. S. likely would have provided meaningful information relevant to determining whether Victoria was or may be an Indian child. (See *In re Antonio R.*, *supra*, 76 Cal.App.5th at p. 435 ["in determining whether the failure to make an adequate initial inquiry is prejudicial, we ask whether the information in the hands of the extended family members is likely to be meaningful in determining whether the child is an Indian child, not whether the information is likely to show the child is in fact an Indian

25

child"].)[12] This is one of those cases where inquiring of an extended family member or someone with an interest in the child would not likely provide meaningful information about the child's possible Indian ancestry. (Cf. *Antonio R.*, at p. 435 ["'[i]n most circumstances, the information in the possession of extended relatives is likely to be meaningful in determining whether the child is an Indian child—regardless of whether the information ultimately shows the child is or is not an Indian child'"].)

As for Kimberly's assertion the social worker should have used an official Spanish-language interpreter instead of relying on Rocio to translate for Maribel, Kimberly has not cited any authority for the proposition an official interpreter is required, nor has she demonstrated any prejudice. (See *In re Adrian L.* (2022) 86 Cal.App.5th 342, 344, fn. 1 [failure to support an argument with "reasoned argument and citations to authority" forfeits the argument]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [same].) The social worker asked Rocio to ask Maribel if the family had any Indian ancestry, and Rocio told the social worker Maribel answered the question in the negative. Kimberly does not claim Rocio made any mistakes in translating the social worker's questions or Maribel's responses. There is no reasonable probability interviewing Maribel again with a different interpreter would have yielded any different answers.

---

[12] The question of which standard of prejudice applies in evaluating ICWA inquiry error is currently pending in the Supreme Court in *In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted Sept. 21, 2022, S275578.

26

## DISPOSITION

The juvenile court's order terminating Kimberly's parental rights is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

FEUER, J.